UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:21cr41-FDW |
| | ) | |
| | ) | **BILL OF INDICTMENT** |
| v. | ) | |
| | ) | Violations: |
| | ) | |
| MICHAEL A. KENNEDY | ) | 18 U.S.C. § 1349 |
| | ) | 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 1346 |

**THE GRAND JURY CHARGES:**

At the specified times and at all relevant times:

### Introductory Allegations

1.  From at least 2009 through at least May 2016, Defendant MICHAEL A. KENNEDY and others, including Brian Ewert and Choung "Shawn" Nguyen (charged elsewhere), conspired with each other and with others, known and unknown, to carry out a fraudulent bribery and kickback scheme to defraud Cargill, the employer of KENNEDY and Nguyen. During the course of the scheme, Ewert provided KENNEDY, Nguyen, and other Cargill employees with more than a million dollars in cash, gifts, and vacations, which KENNEDY, Nguyen, and other Cargill employees concealed from Cargill in breach of their fiduciary duties to Cargill. In exchange for the illicit bribes and kickbacks, KENNEDY, Nguyen, and other Cargill employees helped Ewert and companies he controlled, including WDS, to obtain, keep, and expand their business with Cargill, to conceal overcharging of Cargill by WDS, and to otherwise further the interests of Ewert and companies he controlled, including WDS, over those of Cargill.

2.  In early 2016, after others within Cargill began questioning the relationship between WDS and Cargill, KENNEDY, Ewert, and Ewert's business partner and co-owner of WDS, Jennifer Maier (charged elsewhere), took a variety of actions to conceal from Cargill significant overcharging of Cargill by WDS. Cargill eventually discovered the truth and then terminated its relationship with WDS and Ewert and fired KENNEDY and Nguyen.

### Background

3.  WDS, Inc., also known as Women's Distribution Services, Inc., ("WDS") was a company based in Lake Wylie, South Carolina, that provided non-raw materials and services to Cargill and its affiliates, such as personal protective equipment for Cargill employees and packaging for meat products. WDS did not manufacture the products it provided to Cargill. Instead, it generally obtained them in bulk from third-party vendors and/or affiliated companies and warehoused them until needed by Cargill.

4.  The relationship between WDS and Cargill was governed by a series of agreements ("Select Supplier Agreements"), which set forth, among other things, the margins that WDS could charge Cargill. Beginning in 2009, the Select Supplier Agreements generally provided that WDS

could charge Cargill no more than a 10% fixed margin above the cost at which WDS obtained products from the third-party vendors (the "markup").

5. By no later than 2012, the Select Supplier Agreements also included a volume rebate provision, which required WDS to make quarterly payments back to Cargill based upon the amount of overall purchases Cargill made from WDS. Generally, the more Cargill purchased from WDS, the higher the rebate WDS owed Cargill.

6. Ewert was a co-owner of WDS and a resident of Charlotte, North Carolina. Ewert was WDS's primary sales representative and was responsible for setting the prices that WDS charged Cargill.

7. Maier was a co-owner and Chief Executive Officer of WDS and a resident of Lake Wylie, South Carolina. Maier was the majority owner of WDS.

8. Cargill, Incorporated was a Minnesota-based corporation and one of the largest privately held corporations in the United States. Cargill had numerous subsidiaries and affiliates, including Cargill Meat Solutions Corporation (collectively, "Cargill"). One of the business functions within Cargill was called Strategic Sourcing. The Strategic Sourcing Function was responsible for, among other things, overseeing Cargill's procurement of packaging products and distribution services for various Cargill business units and subsidiaries. The Strategic Sourcing Function was responsible for the negotiation, implementation, and monitoring of the Select Supplier Agreements with WDS.

9. Cargill had a Code of Conduct, which included, among other things, policies regarding the receipt of gifts and bribes. Those policies prohibited Cargill employees from "directly or indirectly ... solicit[ing] or accept[ing] any form of bribe, kickback or other corrupt payment..." and from "accept[ing] any gift or entertainment where it could cause – or give the appearance of causing – Cargill or Cargill employees to grant or receive any favor in return." Cargill's policies expressly prohibited its employees from accepting cash or cash equivalents.

10. KENNEDY was a senior Cargill employee within the Strategic Sourcing Function, who was based in Wichita, Kansas, and who owed fiduciary duties to Cargill. In addition to his regular responsibilities within the Strategic Sourcing Function, KENNEDY also was responsible for ensuring other employees subordinate to him were trained on Cargill's Code of Conduct. Cargill terminated KENNEDY in or around May 2016.

11. KENNEDY met Ewert in or around 2006 through a mutual friend and business associate. In or around 2007, KENNEDY helped Ewert start a business relationship with Cargill.

12. Nguyen was a Cargill procurement manager within the Strategic Sourcing Function and a resident of Wichita, Kansas, who owed fiduciary duties to Cargill. Nguyen's job focused on, among other things, implementation and monitoring of the Select Supplier Agreements with WDS. In that role, he reported to KENNEDY until in or around 2015. Cargill terminated Nguyen in or around May 2016.

2

## The Concealed Bribery and Kickback Scheme

13. After WDS began supplying Cargill, Nguyen began hearing complaints from other Cargill employees about WDS, including complaints that the prices WDS was charging Cargill exceeded the allowable prices under the Select Supplier Agreements. Nguyen raised some of the issues with Ewert, who acknowledged them, indicated KENNEDY knew about them, and indicated that Ewert needed some time to fix them. Ewert asked Nguyen to refrain from escalating the issues to anyone else at Cargill until Ewert could resolve the issues.

14. In furtherance of the scheme and as part of the conspiracy, Nguyen agreed not to raise the pricing issues with anyone else at Cargill. In exchange, Ewert began bribing Nguyen with cash and gifts. Ewert first provided relatively small payments – a few hundred dollars each – but the size of the payments grew over time. By no later than 2011, Ewert regularly made large cash payments to Nguyen. On a few occasions, Ewert made separate very large cash payments to Nguyen, which represented kickbacks from manufacturer rebates Ewert had received.

15. In addition to the cash payments, and in furtherance of the scheme and as part of the conspiracy, Ewert also provided Nguyen with gifts and paid for vacations for Nguyen and his family. For example, Ewert purchased electronics for Nguyen and paid for at least two Florida vacations for Nguyen and his family.

16. In furtherance of the scheme and as part of the conspiracy, Ewert also paid significant cash bribes and kickbacks to KENNEDY, and Ewert provided KENNEDY and his family with lavish trips. For example, Ewert flew KENNEDY and his family to the Caribbean on Ewert's private jet and rented a luxury yacht to entertain KENNEDY and his family on multiple occasions. These trips, which Ewert paid for, cost hundreds of thousands of dollars. Ewert also paid for KENNEDY and his family to go to Disney World and took them on ski trips. Ewert also arranged with KENNEDY to name KENNEDY as a beneficiary in Ewert's will.

17. In furtherance of the scheme and as part of the conspiracy, and to avoid detection, Ewert typically paid the bribes and kickbacks alone, in person, and in cash. He communicated with Nguyen and KENNEDY on private email addresses, including private email accounts set up by Ewert for the sole purpose of communicating discreetly with them. In order to pay the bribes and kickbacks in person, Ewert often would fly from North Carolina to Kansas on his private jet.

18. In furtherance of the scheme and as part of the conspiracy, and to avoid detection, Nguyen and KENNEDY lied to Cargill about their compliance with Cargill's Code of Conduct and related policies. For example, in or about July 2014 and July 2015, KENNEDY falsely certified to Cargill that he, among other things, had not and would not solicit or accept any form of bribe or kickback.

19. In furtherance of the scheme and as part of the conspiracy, in exchange for the cash payments, trips, and gifts, KENNEDY, Nguyen, and/or other Cargill employees took a number of improper actions in violation of their fiduciary duties to Cargill. Among other things, KENNEDY, Nguyen, and/or others:

3

a. Helped to conceal WDS's overcharges from others at Cargill so that they could continue;

b. Provided Ewert with confidential information about Cargill's business, including confidential information about prices WDS's competitors charged Cargill. For example:

  i. On or about May 1, 2012, KENNEDY emailed Ewert a confidential Select Supplier Agreement entered into between Cargill and one of its suppliers, which included the supplier's pricing information.

  ii. On or about April 14, 2015, KENNEDY received an email to his Cargill email address containing information on markups various suppliers applied to certain products purchased by Cargill. The following day, KENNEDY forwarded this email to his personal email address and then sent it via email to Ewert.

c. Helped WDS and other entities affiliated with Ewert expand the scope and volume of their business with Cargill;

d. Drafted and revised responses, proposals, and other communications for Ewert to submit to Cargill. For example:

  i. Between on or about April 22, 2014 and April 26, 2014, KENNEDY, using his personal email address, reviewed a draft email for Ewert regarding flow tite prices that WDS could submit to Cargill.

  ii. On or about September 30, 2014, Ewert forwarded an email to KENNEDY's personal email address regarding, "Agenda for 10-6-2014" about an agenda for an upcoming meeting between WDS and Cargill to talk about a planned audit of WDS. On or about October 3, 2014, KENNEDY responded via email providing Ewert with talking points for WDS to use during the meeting.

e. Quashed and minimized complaints about WDS raised by other Cargill employees;

f. Delayed or impeded audits of the prices that WDS charged Cargill;

g. Assisted Ewert in concealing his interest in other companies that began providing materials to Cargill;

h. Attempted to circumvent Cargill's directive to cease doing business with Ewert;

i. Assisted Ewert in misleading Cargill about Ewert's departure from WDS; and

j. Improperly approved variances and/or classified products as being out of scope.

4

20. In addition, in furtherance of the scheme and as part of the conspiracy, KENNEDY "waived" more than $890,000 in rebate payments that WDS owed to Cargill under the Select Supplier Agreements.

21. With KENNEDY's and Nguyen's assistance, the volume of sales that WDS and other entities affiliated with Ewert made to Cargill increased dramatically from 2008 through 2015. For example, between early 2012 and early 2016, Cargill purchased nearly $500 million in products from WDS.

## The Cover-Up

22. In late 2015, Cargill restructured the Strategic Sourcing Function. As a result, KENNEDY no longer had direct oversight of Cargill's relationship with WDS. With KENNEDY removed, the Strategic Sourcing Function began to apply proper oversight to Cargill's business with WDS.

23. On or about December 11, 2015, Cargill initiated an audit of WDS and requested that WDS provide it with information about the prices WDS paid for certain materials that WDS sold to Cargill.

24. In furtherance of the scheme and as part of the conspiracy, Ewert alerted KENNEDY about the audit request. KENNEDY, who no longer had responsibility for overseeing the relationship with WDS, then communicated with Ewert about how to impede or stop the audit. For example:

   a. On or about December 15, 2015, KENNEDY sent an email to Ewert using one of KENNEDY's personal email accounts. The subject of the email was "elevator speech," and it set forth various arguments WDS could make to influence Cargill to stop the audit.

   b. On or about January 13, 2016, KENNEDY sent another email to Ewert using one of KENNEDY's personal email accounts. The subject of the email was "Re: FW: Audit – Internal." In the email, KENNEDY suggested that Ewert delay and impede the audit by sending only the information that made WDS appear to be in compliance – and to send it in a piecemeal fashion. Specifically, KENNEDY wrote, "I would send everything 10% and below…2 or 3 at a time. That will keep him busy."

25. In furtherance of the scheme and as part of the conspiracy, KENNEDY, Ewert, and others took other steps to impair and impede Cargill's audit of WDS. For example:

   a. In or around January 2016, Ewert solicited one of WDS's major suppliers ("Supplier A") for help with misleading Cargill about the prices Supplier A charged WDS, but Supplier A refused.

   b. KENNEDY subsequently communicated with Supplier A and instructed it not to provide the pricing information requested by other Cargill employees.

c. On or about March 2 and March 3, 2016, KENNEDY used his personal email address to correspond with Ewert about the issues WDS was having with Cargill. KENNEDY encouraged Ewert to give notice to Supplier A that WDS believed that Supplier A had breached its contract with WDS by providing Cargill with certain pricing information. Ewert also advised KENNEDY that he planned to "send out my firing letter today or tomorrow so maybe we can play this in our favor on the sympathy path...." KENNEDY responded, "Sounds good to me."

d. On or about March 11, 2016, Maier had a telephone call with Cargill representatives, including KENNEDY, regarding Cargill's audit. During the call, Maier falsely claimed that WDS had never charged Cargill more than a 10% markup. KENNEDY did not correct Maier.

e. After the call on March 11, 2016, KENNEDY emailed Maier giving her advice on how WDS could disperse the "dark cloud" hanging over its head and advising her that "we [need to] build up the confidence in WDS operations again." That same day, KENNEDY also forwarded Maier an internal Cargill email discussing that Supplier A was willing to provide Cargill the requested pricing information but Supplier A had concerns over its confidentiality obligations to WDS, and advising her that "this is the info...you'll need to address."

f. On or about March 13, 2016, KENNEDY, using his personal email address, emailed Ewert regarding "options," discussing topics and strategies for an upcoming meeting between WDS and Cargill to discuss Cargill's concerns with WDS.

g. When it became clear that Cargill would not drop its demand for proof of the prices Supplier A charged WDS, WDS created more than 100 falsified invoices that were purportedly from Supplier A to WDS and emailed those falsified invoices to Cargill on or about March 25 and March 28, 2016. The fraudulent invoices falsely overstated the prices at which WDS purchased products from Supplier A to conceal the fact that WDS had overcharged Cargill for those products under the Select Supplier Agreement.

26. Ewert and Maier continued to mislead Cargill in furtherance of the scheme and as part of the conspiracy after the falsified invoices were sent to Cargill. For example, on or about April 12, 2016, Maier, with input from Ewert and KENNEDY, sent an email to a Cargill executive "to set the record straight." In that email, Maier falsely claimed, among other things, that Supplier A would not release WDS of its confidentiality obligations to allow WDS to provide Cargill with the prices that Supplier A had charged WDS, and that WDS had been complying with its pricing obligations under the most recent Select Supplier Agreement.

27. On or about April 21, 2016, Cargill initiated a more comprehensive audit of its relationship with WDS and requested additional pricing information from WDS. In furtherance of the scheme and as part of the conspiracy, WDS, through Ewert and Maier, again resisted providing Cargill the requested information.

28. Despite the efforts of KENNEDY, Ewert, and Maier, Cargill eventually obtained some accurate pricing information from Supplier A in or around May 2016. After Cargill learned

6

that WDS had been overcharging it and that WDS had sent it falsified invoices to cover up those overcharges, Cargill attempted to identify the scope of the overcharging.

29. As part of Cargill's investigation, it interviewed KENNEDY and Nguyen. In furtherance of the scheme and as part of the conspiracy, both KENNEDY and Nguyen lied to Cargill about their relationships with Ewert, their receipt of bribes and kickbacks, and their efforts to help WDS and Ewert.

30. Cargill terminated KENNEDY and Nguyen in or around May 2016, and it eventually terminated its relationship with WDS.

## COUNT ONE

## 18 U.S.C. § 1349
## (Conspiracy to Commit Honest Services Wire Fraud)

31. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs one through thirty of this Bill of Indictment, and further alleges that:

32. From at least 2009 through at least April 2016, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

## MICHAEL A. KENNEDY

and others known and unknown to the Grand Jury, including Brian Ewert and Choung "Shawn" Nguyen, did knowingly combine, conspire, confederate and agree to commit honest services wire fraud in violation of Title 18, United States Code, Sections 1343 and 1346.

### Object of the Conspiracy

33. *Honest Services Wire Fraud:* It was a part and an object of the conspiracy that KENNEDY, and others known and unknown to the Grand Jury, having devised the above-described scheme and artifice to defraud and to deprive KENNEDY's employer, Cargill, of its intangible right to honest services of KENNEDY, Nguyen, and other Cargill employees, by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purposes of executing said scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit Ewert paid bribes and kickbacks to KENNEDY, Nguyen, and other Cargill employees, in violation of those employees' fiduciary duties to Cargill, in exchange for KENNEDY's, Nguyen's, and other Cargill employees' efforts to, among other things, help Ewert and companies he controlled, including WDS, obtain, keep, and expand their business with Cargill, to conceal overcharging of Cargill by WDS, and to otherwise further the interests of Ewert and companies he controlled, including WDS, over those of Cargill.

## Manner and Means

34.  KENNEDY, Nguyen, Ewert and others known and unknown to the Grand Jury, carried out the conspiracy in the manner and means as set forth in paragraphs thirteen through thirty above.

All in violation of Title 18, United States Code Section 1349.

## COUNT TWO
## 18 U.S.C. § 1343
## (WIRE FRAUD – HONEST SERVICES)

37. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs one through thirty of this Bill of Indictment, and further alleges that:

38. From at least 2009 through at least April 2016, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**MICHAEL A. KENNEDY**

and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and to deprive KENNEDY's employer, Cargill, of its intangible right to honest services of KENNEDY, Nguyen, and other Cargill employees, by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, did transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purposes of executing said scheme and artifice, to wit Ewert bribed KENNEDY, Nguyen, and other Cargill employees, in violation of those employees' fiduciary duties to Cargill, in exchange for KENNEDY's, Nguyen's, and other Cargill employees' efforts to, among other things, help Ewert and companies he controlled, including WDS, obtain, keep, and expand their business with Cargill, to conceal overcharging of Cargill by WDS, and to otherwise further the interests of Ewert and companies he controlled, including WDS, over those of Cargill.

All in violation of Title 18, United States Code, Sections 1343 and 1346.

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment;

b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

The following property is subject to forfeiture on one or more of the grounds stated above:

a. A forfeiture money judgment in the amount of at least $500,000 or such other amount as determined by the Court, such amount constituting the proceeds of the violations set forth in this Bill of Indictment.

A TRUE BILL:

R. ANDREW MURRAY
UNITED STATES ATTORNEY

DANIEL RYAN
ASSISTANT UNITED STATES ATTORNEY

GRAHAM BILLINGS
ASSISTANT UNITED STATES ATTORNEY

10